May it please the Court. My name is Eric Bachman. I represent the appellant, Jon Oberg. There are two key issues that show why this judgment below should be vacated. The first is that the District Court failed to instruct the jury on a key difference between the False Claims Act and more traditional types of common law fraud. Second, the District Court wrongfully excluded government investigation reports that were relevant to an essential element under the False Claims Act and bore directly on the credibility of key witnesses. As to the first issue, there's a major difference between False Claims Act cases and other types of fraud cases, and that is that a plaintiff is not required to prove that the defendant had a specific intent to defraud the government, unlike in common law fraud cases where one party must prove that the other party had a specific intent to defraud. Can I just ask a question? Is it your contention that something in the instructions suggested to the contrary that there was a requirement of specific intent to defraud? Not specifically to the contrary. However, by not explaining that no specific intent is required, the District Court did leave out a defining marker in the instructional map. What I mean by that is that the District Court told the jury mere negligence or a mistake is not enough. But by not giving the necessary context in the statute that, on the other hand, Dr. Oberg was not required to prove specific intent, that these were therefore an inaccurate and incomplete explanation of the law to the jury. Now, this is important. Can you talk to me about preservation of your argument? Yes, Your Honor. It's our contention as set forth in the brief that the error was preserved. Well, maybe you can walk me through where you preserved it. Yes. The first instance is that Dr. Oberg's trial counsel presented proposed instructions. During the charge conference, the District Court then said unequivocally, I am not giving anybody's instructions. I'm going to give my own instructions. Therefore, under Supreme Court cases as well as certain Fourth Circuit cases. What happened after that? He instructed the jury. Well, let me back up. What he did during the charge conference, the District Court outlined the general topics that he would instruct the jury on. He did not provide the written instructions to the parties. He did not tell them in any detail what the actual instructions were going to be. He then proceeded to instruct the jury. Right. And at that point, he actually excused the jury and then asked if there were any objections on the record. Right. And then you laid out your objections? Trial counsel did not object at that point. That's correct. Well, that's a problem for you, isn't it? Respectfully, our argument is that under Federal Rule of Civil Procedure 51D1B, that that prior ruling was a definitive rejection of the instructions on the record. He asked you after he had given the instructions if you had any objections. And you said no. That's correct. I just want to be sure I understood the record. I think we maybe read the rule and the change to the rule a little differently. So if you want to offer me any argument about that, I'm happy to listen to you. Well, thank you, Your Honor. And as we noted in our brief, there is a Supreme Court decision in Justice Scalia's concurrence in Connick v. Thompson in which he noted that where the district court in that case rejected the parties' proposed instruction and said, I consider that a summary judgment, I'm not giving that instruction, that that was sufficient to preserve the error. Was there same subsequent interplay between the district judge and the lawyer in the Supreme Court case? That there was a request if any objections after. Yeah. That's not laid out in the Supreme Court. Well, the trial counsel actually said no objections from a later. He did say that, Your Honor. Yes. Okay. So maybe you'd better spend your time more wisely arguing why this was plain error. Thank you, Your Honor. And we do submit this was plain error as well. As I noted, and that's for three reasons. As I noted at the outset at the charge conference, the district court first only provided just a general outline of the topics on which he would instruct the jury, did not provide the actual instructions before giving them to the jury. There was no opportunity to object before the jurors' deliberations began. And more importantly, at the point at which the jury asked to be instructed again, they came back to the district court and said, can you please tell us the instructions again? When the district court told the jury about the science requirements, he limited his instruction to say simply, three, the defendant knew the claim was false or fraudulent at the time it was made. And, again, provided no opportunity to object before he excused the jury again to deliberate. But more importantly, that terse abbreviated instruction on scienter made no mention of deliberate ignorance or reckless disregard and obviously not the no specific intent to defraud requirement either. So that final. Can I just go back for one second? My colleague very nicely asked you to talk about plain error. And I wondered if you were arguing that this is plain error. And if you are, where that argument might be found in your briefs. Well, the argument is in the briefs where we talk about how the abbreviated instructions that he gave to the jury when they came back asking to be instructed again, we said that those were even less helpful than the initial instructions. Right. I've read that. It's the standard of review is what I'm looking for. And did you make the argument in your brief that our standard of review is plain error? We argued initially that it was abuse of discretion, but in the alternative that it was also plain error under the Choi case and others. Okay. So what we have here, though, is this final instruction that was given to the jury before they resumed their deliberations did not cover specific parts of the scienter requirement. Right. But the jury's instruction was just to ask, excuse me, the jury's question, they asked the court what were the five things that had to be found, didn't they? They asked what are the, yes, the five elements. Right. And so there was nothing in the note that suggested that the jury was only considering scienter, was it? No. Nothing in the note that suggested that. So then do you have any authority that says there's plain error for a judge to fail to instruct a jury about what it's not required to find? Because it seems to me in order for you to prevail on this point today, you've got to show us some authority that that is plain error, to fail to tell a jury what it's not required to find. Well, in the Troy case, this court had found that the instructions given by the same district court were incomplete and inaccurate and failed to state the controlling legal principles. And here we submit that the same is true, particularly with respect to this last instruction, that not only did it not mention no specific intent to defraud, but also failed to mention reckless disregard or deliberate ignorance. It left the impression that to prove that FEA had knowledge, that it had to be actual knowledge that FEA possessed. And we would submit that that is plain error. The second key error that we raised in our brief is the district court's exclusion of the Pennsylvania Auditor General investigation reports. And we submit these should have been admitted under Federal Rule of Evidence 403 because their probative value was not substantially outweighed by any prejudice to FEA or confusion of the issues. And we recognize, of course, that district courts do have wide latitude on evidentiary decisions like this, but submit that bounds do exist and should be applied here because these reports, these government investigation reports were relevant rebuttal evidence that helped prove an essential element under the False Claims Act, which is SciENTER, and also bore directly on the credibility of several key witnesses here. Essentially, what was able to happen here is during the trial, many of FEA's key executives were allowed to repeatedly inject this idea of benevolent motive, meaning that they were going to return all the profits from this 9.5 percent SAF scheme to their borrowers. They were able to repeatedly inject that during the opening statement, during the witness testimony, and during the closing arguments. That's from the CFO, the CEO, and another executive over 20 different times injected this idea into their testimony. And Dr. Obrecht did object but was overruled at least twice during the course of the trial. Can you help me just understand something about the relevance of this information? Why is a benevolent motive or the absence of a benevolent motive, why is that relevant in a case where the defense is the objective reasonableness of the interpretation of the regulations? I mean, that's an objective standard, right? And so why would it matter? The motive, usually when people exploit loopholes, it is, in fact, to make money. But if it's an objectively reasonable reading, that's all we need to know. So why does the motive matter in this kind of case? Thank you, Ari. The motive matters here because, and we would agree, if FIA had not raised this motive during the trial, we would not be asking, we would not be submitting that motive evidence should have been considered here. But once that is injected into the trial, once they're talking about their motive for carrying out this scheme, where there's relevant rebuttal evidence that says, actually, no. Well, did the report, it didn't mention the HFSAP loans, did it? It did not, but it did. Okay. And did it mention the interest rates, the HFSAP interest rates, or anything that would tie the subject matter of the False Claims Act action to these reports?  So your sole theory is the collateral issue, then, of the fact that these guys were spending money on trips to Hershey Park and getting big salaries, then they were more likely to have been interested in defrauding the government. Isn't that essentially what your argument is reduced to? It's essentially that if they had a motive to personally profit from this scheme, they were more likely to recklessly forge ahead with the scheme. Yes, that is correct. And as I said, had this not been injected into the trial by the executives, and I understand FIA's argument is that some of this came under questioning from Dr. Oberg's trial counsel, but reading the record shows that often those answers were not responsive to the question asked. So this was a tactic, a strategy used by FIA to put before the jury this idea that if FIA is not personally profiting from this, then what motive would they have to commit fraud? And therefore, where there are government investigation reports that did review FIA's operations during the time it was carrying out this scheme and did review how FIA was using these profits from the overall company, which this scheme contributed millions of dollars to, and found that the opposite of what these executives were testifying to, not that they were returning all the profits to the borrowers, but instead that they were lining their own pockets with FIA's profits and that they were not fulfilling their statutory duty to have all money go towards their borrowers. And while it's true that it's not a requirement for Dr. Oberg to prove motive in a False Claims Act case, that should not be turned against him to exclude relevant rebuttal evidence that goes to motive that's been raised by the defendant in a case like this. And for that reason- Let me just go back to my sort of, I guess my fundamental concern about this case. Even if I were to assume bad motive, if I think that it is, there's overwhelming evidence that whatever the motive, the defendant's interpretation of this regulatory regime was reasonable and it was widely shared at the agency, does it make any difference? Respectfully, it does. Okay, how come? Why isn't any error about this report just harmless? Because, well, there is the Tyson case, which found that motive can go to the question of whether the defendant even had a reasonable interpretation. That's fine, but I'm sort of asking you to assume hypothetically, and I understand you don't agree. But what if I think there's overwhelming evidence that this was an objectively reasonable interpretation of this complicated regulatory regime and that it was widely held by the agency in question? If I think that, at that point, does it matter whether this report came in? My time is up, but may I answer? Assuming all of those facts, yes, I would agree with Your Honor.  Thank you very much. Mr. Hayes? Thank you, Your Honor, and may it please the Court, George Hicks for appellee FIA. After a five-day trial involving 16 witnesses and over 100 exhibits, a jury determined that FIA did not violate the False Claims Act when it submitted claims to the Department of Education for certain government subsidies. The jury's verdict was consistent with overwhelming, unrebutted evidence at trial that during the relevant time period, the Department of Education and numerous other government entities repeatedly deemed FIA's conduct permissible, thereby defeating any suggestion that FIA knowingly or recklessly submitted false claims. After hearing days of uncontradicted testimony about the government's repeated assurances that FIA's conduct was perfectly legal, the jury needed only a few hours to correctly conclude that FIA did not violate the False Claims Act. Hobart now asked this Court to overturn the jury's well-supported verdict and order an entirely new trial on the basis of two alleged errors, both of which this Court reviews under a deferential standard of review. First, he contends the District Court should have given the jury three of his proposed instructions. But when the District Court explicitly and unequivocally asked the parties if there were any objections to the instructions it gave the jury, Oberg explicitly and unequivocally responded that he had, quote, no objection to those instructions. Accordingly, this Court's review is under the demanding plain error standard, which Oberg does not come close to satisfying, nor does he even really try. But even if plain error review did not apply, this Court's review is for abusive discretion, and the District Court did not abuse its substantial discretion in declining to give Oberg's unnecessary, confusing, and incorrect instructions. Second, Oberg contends that the District Court should have admitted a report by the State Auditor General, but the District Court did not abuse its discretion in excluding that report, which was irrelevant and prejudicial and cumulative in any event. But regardless, even if there were evidentiary or instructional error, the jury's verdict should still stand. The jury heard days of uncontradicted evidence that during the relevant time period, the government fully knew about the conduct at issue in this case, repeatedly declared that conduct permissible, and continued to pay every single one of the subsidies that FEA claimed. On appeal, Oberg mischaracterizes that evidence, but the jury correctly saw it for what it was. Evidence that overwhelmingly defeats False Claims Act liability. And in short, the jury's verdict for FEA should be affirmed. Now I'd like to start with the jury instruction issue, as that was the first issue that my friend on the other side raised. And as the questions reflected, this issue was not preserved. The District Court gave the parties multiple opportunities to object to the instructions. He did it. In fact, he previewed how he was going to give his instructions. And then he actually said at the time that he was going to give them two opportunities to object. So first he says, I will give my own instructions. And he previewed what those instructions would be. And then he said, is there anything else I need to tell them? Oberg did not object. That's at 1281 of the Joint Appendix. And then, of course, after the Court gave those instructions to the jury, the exact instructions, he asked, is there any objection to the instructions that I gave or the manner in which I gave them? Oberg's counsel responded, no objection from relator. That's at 1336. So this wasn't even a situation where Oberg's counsel failed to object. This was an affirmative denial of an objection. Oberg was plainly satisfied with the instructions that the jury received and only now is belatedly arguing that they were improper because he lost. And under that affirmative denial of an objection, plain error review applies. And I think there was a question about where the plain error review argument was ever made. And it really wasn't. Well, they did make it in a footnote. They made it on page 54, footnote 15 of their brief, didn't they? You are correct, Judge Keenan. This Court has held, of course, that an argument solely raised in a footnote is not sufficient and it is Oberg's burden to prove the demanding plain error standard. But even if you wanted to look at plain error review, as we discussed in our brief, certainly there was nothing that was clear or obvious error. And I'll talk about how there wasn't any error if you like, but certainly there was not any clear or obvious error in any of the jury instructions. But also it had no substantial effect on the outcome below, given the overwhelming evidence of the lack of center. And also the fourth prong of plain error review, which is whether there was a miscarriage of justice or some sort of fundamental concern about the reputation of the courts if this is upheld. And the best argument- Can I ask you just a quick question about, I think it was the third instruction, some instruction on what the statute and regulatory regime actually means. So is the theory, because the jury didn't have an instruction on that, and I believe they didn't have a copy of the statute or the regulations. So, I mean, I can look at the statute and regulations and figure out whether I think this seems like an objectively reasonable construction, but the jury couldn't have done that. So is the theory that it was enough, the evidence that was presented, the jury shouldn't look at the language and make a judgment about that. It's sufficient that there was evidence at trial that the agency concurred in that interpretation. Do you know what I'm saying? Right on its face, the regulation said, well, the one thing you can't do is this transfer and filling thing. Yes, Your Honor, to be clear, your question is kind of going towards the falsity prong of the False Claims Act. I guess so. The emphasis at trial was about scienter, and I think that's what you're saying. My question is, yeah, more going- Which is that, look, there could have been an instruction from the judge that said, look, you know, this conduct was illegal at the time, but the whole point of the trial and where everything was directed at was whether FIA, during the relevant time period, had an objectively reasonable interpretation. How is a jury supposed to know that if they're not looking at the statute and the regulations and the judge hasn't instructed them on the statute and the regulations? How does the jury make an assessment as to whether this reading of the regulations is reasonable? Oh, because I think that they can do that from the overwhelming evidence about what the government was saying at the time, and even Oberg was saying at the time. I mean, FIA, the government, the lenders, Oberg himself, everybody at the time was saying that this conduct, this interpretation, was permissible because of the 1996 Dear Colleague letter, and the government repeated that in 2002, 2003, 2004, 2005. So I think a jury could easily look at that, and even if it, I mean, I could look at a very complicated statute about Medicare reimbursements and not really kind of know what's going on, but if somebody showed me a lot of evidence that said, look, throughout a relevant time period, the government said that whatever someone was doing was perfectly legal and that the only way it would become illegal is by a change in the law, you know, that's the kind of evidence that overwhelmingly shows that FIA had an objectively reasonable interpretation at the time, and that it was not warned away. There's no regulatory language that could defeat that, is your view, even if the regulation says on its face, plain as day, this is one thing you can't do. I can't remember. It's called transfer and fill. You can't do that. It wouldn't really make any difference, in your view, so long as the agency is allowing it. Well, I think it, you know, it would be a harder question for the agency, and you could certainly question the agency about, you know, why are you telling us one thing when this regulation says the complete opposite? You know, but I think even at that point, if the only thing that a regulated party were looking at was, you know, what is the agency telling me, the people who enforce the laws and who are going to penalize me if I'm not following the laws, that's what we're going to go with. And, you know, if an agency, and it wasn't just the agency here. It was Congress. It was the GAO. I mean, everybody, including, again, Oberg himself was saying that pursuant to the 1996 Dear Colleague Letter, which, of course, did not say anything contradictory at all, but everybody was saying that if you look at the 1996 Dear Colleague Letter, yes, what's going on here is perfectly legal, and the only way to stop it from happening is for there to be a change in the law, and that's exactly what happened when you get to 2006. Congress passes a law that shuts it off, and all of the conduct stops. So this is exactly, falls squarely into your question about, you know, objectively reasonable interpretation, you know, not being relevant to motive, and this starts to get into the Attorney General Report, I'm sorry, the Auditor General Report a little bit, but you're exactly right, Judge Harris. The Supreme Court in Safeco and the D.C. Circuit in the Purcell decision, you know, said squarely that this is the D.C. Circuit and Purcell. This is Judge Rogers, Brown, and now Justice Kavanaugh. Subjective intent is irrelevant when a defendant seeks to defeat a finding of knowledge based on its reasonable interpretation of the law. That's at page 290 of Purcell, and that's a post-Safeco case. And, of course, in Safeco, at footnote 20, the Supreme Court said exactly the same thing. And so that's exactly what we have here. We have overwhelming evidence of an objectively reasonable interpretation taken by FIA, taken by the government, taken by Dr. Oberg himself. And so as a result, it doesn't matter what FIA's motive was or whether it had subjective intent because that is contrary to Safeco and Purcell. Going back to the jury instruction issue, again, I wanted to just wrap up the fourth prong of the plain error standard, which, again, is that this Court has to think that a real miscarriage of justice occurred. And I think the best evidence that no miscarriage of justice occurred is that Dr. Oberg himself called the outcome of this trial a victory because, you know, he lost, but he got a lot of great information out there about what student lenders were doing, et cetera. And, you know, whatever else you want to think about plain error review and a miscarriage of justice, I don't think it qualifies. Well, I mean, that's a fine debating point. But speaking for myself, that doesn't move me. If they had satisfied the other three elements of plain error review, I don't think I would say, well, there's no miscarriage of justice here because the client said X, as clients often do. I mean, he's not quite on the point and they don't quite know where it's going. Understood, Judge Motz. But I think the other three elements of plain error review, again, Oberg doesn't really make much of an argument that he does satisfy it, even though it is his burden. I mean, we discuss in our response brief why there is not clear or obvious error. There are no decisions that are supporting the precise points or saying that it's obvious that something would not have been included. You know, for example, he cites the Choi case. But that's an example where the district court left out an element that was required to prove liability. And when you do that, you know, you've got a real due process violation on your hands because you've got a defendant or, you know, could be a criminal defendant who's been convicted or found liable without the elements for liability being given to the jury. But that's not the situation we have here. For example, with this instruction of, well, you know, here are the elements you need to find false claims act liability and here's something else you don't need to find. I mean, number one, you know, that's unnecessary. When you've articulated the elements that a jury needs to find for liability, that necessarily subsumes what they don't need to find. But also, it's very confusing to a jury to have these elements. Okay, this is what we need to find. And then there's this additional instruction of, but you don't need to find this. You know, not only I think is that confusing on its face to a lay jury, but when the concept at issue is specific intent, you know, that's not an easy notion for lawyers. Congress thought it was important enough to amend the statute to say that. So how can you say that that's confusing? They put it in the statute. Well, because the reason they put that in the statute, Your Honor, was in 1986, the previous version of the statute only said that liability required knowingly, so knowing action. And there had been courts that interpreted that to mean that the jury had to find specific intent affirmatively. So you would have to have. Right, but what I'm saying is Congress obviously didn't think it was confusing because they thought it was important to put it in the statute. Well, they put it in as a belt and suspenders when they added all of the three types of scienter. And then they added as a belt and suspender that you don't need to find specific intent in order to find scienter. But I think that's a very different thing than saying that a jury has to be instructed on something it need not find. Well, if this were not plain error and it were abusive discretion, would your position, do you think there's more wiggle room? Oh, I still think it would not be an abusive discretion precisely because, again, I think that it is encompassed by the existing elements. And I think it would be confusing to a jury to be told what you need not find, particularly when that thing that you need not find is specific intent. Specific intent never came up at trial. I mean, it was never the subject of anything precisely because it's not part of a false claims act. So the fact that it would be unnecessary and confusing, you know, I think is well within a district court's discretion not to include that sort of instruction. And I think the fact that Dr. Oberg really doesn't have any response to the cases that we cite about how you don't include an unnecessary instruction. For example, we cite two Seventh Circuit cases talking about the need to avoid unnecessary instructions precisely because they are confusing for a jury. And he has no response to them for good reason. Then we cite a case from this court that says that when there's no dispute over something, you don't include it in the jury. Well, there was no dispute over specific intent here because it's not part of a false claims act claim. And he tries to say, well, there was a dispute over scienter. But, again, scienter does not include specific intent. And the dispute over scienter, again, was about the objective reasonableness of FIA's interpretation. And, again, on this point, the evidence is overwhelming that FIA had an objectively reasonable interpretation. And on that point, with my remaining time, I just want to address some of the points that Dr. Oberg. Before you move on, I just want to make sure I get an answer to one little question. I understand your argument on the Auditor General's report for why motive isn't independently relevant. But why isn't it relevant to impeach the credibility of the witnesses who are testifying that everything they do is motivated by a desire to benefit students and consistent with their mission? And then you have this report suggesting, well, that's not true. Sure. A couple of responses, Your Honor. First of all, there was plenty of evidence already in the record about compensation, salaries. And Dr. Oberg could have introduced even more. He says that he was precluded from doing this by the court, but those are just asked and answered objections. So he could have gotten a lot of this information in already. And, in fact, he never really identifies what in the report he would have used to impeach the credibility of these witnesses, precisely because a lot of that information was already in the record. But I think it's important to point out that a lot of the testimony that he says that he would have undermined with this report, he is mischaracterizing. That testimony has nothing to do with the nine-and-a-half special allowance payments that are at issue. Oh, I know that. I'm sorry. I thought the argument, and maybe I'm misframing the argument, was, look, you've got these guys up there and they keep saying everything we do in our jobs, everything we do is motivated by our desire to benefit student borrowers, and everything we do is consistent with that mission. And then you have a report suggesting that is not true. The salaries you pay yourself, for instance, it's not consistent with your mission. It doesn't benefit borrowers. So the idea would be, even though it has nothing to do with the particular facts of this case, it suggests that their testimony was not truthful. Two responses, Your Honor. First, I will push back on the premise, which is that there was all this testimony about how they did everything for the kids. That's not actually what the testimony is. The testimony, if you go back and look at this, it's about a different concept there. They are talking about what's called excess interest under tax-exempt bonds, which could be used for borrower benefits. Excess interest and borrower benefits, those are legal terms under IRS regulations, and what they're talking about there is how what they were doing was they had to use the excess interest from tax-exempt bonds to either they had to use it for borrower benefits or they had to give it back to the government. And in all of these instances where Oberg is saying, Aha, what they were really doing, what they were testifying to was that they're such good people because they were trying to, you know, give more money to students. No, all they're doing is talking about this mechanical application of excess interest to borrower benefits, which is required by IRS regulations. And I think I'll just give you a couple examples where this is mischaracterized in the brief. So at page 13 of Dr. Oberg's opening brief, he says, the profits from the 9.5% special allowance payment loans, quote, had to be used for borrower benefits, period. And he puts, quote, had to be used for borrower benefits, period, because he's quoting one of the fee executives. But he omits the next line, which is the executive being asked, and that would be the excess interest inside those tax-exempt bonds. Answer, yes, correct. That's what they were talking about. You know, another example, you know, again, he says at page 11 of his brief, fee executives sought 9.5% payments so that they could provide benefits to their student loan borrowers. There's no testimony that supports that, and there's testimony that refutes that. When the fee executives were asked why they engaged in this strategy, they explained that it was to increase excess interest. So, for example, at 1086 of the joint appendix, a fee executive asked, was the goal of these loan transfers to grow fees 9.5% loans? Answer, no. So I say all this just to say that there's a distinction between this excess interest for borrower benefits and growing 9.5% loans, you know, for the kids. And, you know, I think the fact that Oberg is mischaracterizing some of this testimony in order to draw some sort of theory of relevance is telling. But I think also at the end of the day, look, even if all of this had something to do with undermining the credibility of the fee executives and by showing that actually they had a questionable motive instead of a purely benign motive, again, it doesn't matter if there's an objectively reasonable interpretation of the law. That's what Safeco says. That's what Purcell says, that as long as there's an objectively reasonable interpretation of the law, it does not go towards motive, which, of course, is not even an element of the False Claims Act at all. And if there are no further questions, the jury's verdict should be affirmed. Thank you. Thank you. I'd like to respond to just a few of the things that my colleague raised. The first is his statement that this testimony about benevolent motive was mischaracterized in the brief. I'm not going to spend a lot of time on this, but I just want to be clear on this. The testimony included things like, question, were you embarrassed by the fact that fee would use its earnings for borrower benefits? Answer, embarrassed by the fact? Question, uh-huh. Answer, I was proud of the fact. Also, some of the testimony that's in the record. Oh, yes. This is in the chart that's in our briefs, and that all of our resources were used for advancing higher education opportunities for Pennsylvanians. On pages 54 and 55 of our brief, that's where I set out the various charts, and I think it's accurate to say that fee executives were injecting this idea that they were turning all these profits to their borrowers to create this inference that they would have no motive to undertake this scheme for a fraudulent purpose, since they weren't going to benefit from it. Now, the other thing I would like to address is this idea that fee has raised that everybody was in agreement that this 9.5% SAP scheme was permissible at every time fee was expressly certifying for payment, that it should receive payment under the scheme, and that's simply not the case. There was an audit conducted by the Department of Education in 2002. It involved an Iowa student loan company, but importantly, it involved the same scheme that's at issue here, and in that audit, it was found that the 9.5% SAP scheme was improper, that they should not be claiming payments on this, and fee continued to seek payments under the scheme during that time period where the audit findings had not yet been revised. It was well over a year-long period in which the Department of Education said this scheme should not move forward. FEA did not consult with their lawyers about this to see if what they're doing is permissible. FEA did not go to the Department of Education and say, hey, by the way, our scheme is the same thing. Is it okay that we continue to seek payment on this? What they did, ultimately, when they were asked by the Department of Education years later about this, their own executives admitted they gave only half an answer here, that they certainly didn't hand over their May 2002 memo that was the architect for this strategy, this 9.5% strategy. So you have them giving these sort of half-truths and omissions, and that is certainly evidence of a reckless disregard or that FEA had been warned away from its interpretation, at least at a minimum, during this time period after the Iowa audit. Now, that audit was revised. Wasn't there an interim period, though, involved where the draft report said that it was going to be reviewed? It was a tentative situation, and you're seeming to suggest that at the time of the issuance, they were on notice absolutely that they couldn't do this. But I thought the report said that it was being subject to review, and it took a year for them to revise the report. So it wasn't quite as black and white, it seems to me, as you're suggesting. That's correct, Your Honor. It did say it was under review, but for FEA to say that there had been no indication that this scheme was impermissible is simply incorrect, given that there was, albeit a draft, but a draft audit finding that student lenders should not be seeking payment under this scheme. And ultimately, the Department of Education, once it disentangled the intricacies of the scheme in 2007, said that you should not be seeking payments under this scheme and found that this scheme had been improper. And so ultimately, it's our position that the district court's judgment should be vacated and remanded because of these two essential areas related to the inadequate jury instructions, as well as the refusal to admit the government investigation reports under Federal Rule of Evidence 403. Thank you very much. Thank you, Your Honor. We will come down and say hello to the lawyers and then go directly to the next case.
judges: Diana Gribbon Motz, Barbara Milano Keenan, Pamela A. Harris